UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                              :
BENJAMIN PARKER,              :
                              :
          Plaintiff,          :     Civ. No. 18-8674(NLH)(JS)
                              :
     v.                       :     OPINION
                              :
UNITED STATES OF AMERICA,     :
FEDERAL BUREAU OF PRISONS,    :
WARDEN JORDAN HOLLINGSWORTH,  :
CORRECTION OFFICER RODGERS,   :
LIEUTENANT ANDERSON, OFFICER  :
VIGERALLO, et al.,            :
                              :
          Defendants.         :
_____:
```

APPEARANCES:
Patrick J. Whalen, Esq.
Attorney at Law, LLC
109 S. Warren Street
Trenton, NJ 08608
     and
Philip J. Cohen, Esq.
Kamensky Cohen Riechelson
194 South Broad Street
Trenton, NJ 08608
     Counsel for Plaintiff

Kristin Lynn Vassallo, Esq.
Office of the U.S. Attorney
970 Broad Street
Newark, NJ 07102
     Counsel for Defendants


HILLMAN, District Judge

     Plaintiff Benjamin Parker, through counsel, filed a

Complaint pursuant to the Federal Tort Claims Act, 28 U.S.C. §§

2671-2680, et seq., against Defendants the United States of
America, the Federal Bureau of Prisons ("BOP"), the former
warden of the Federal Correctional Institution at Fort Dix in
Fort Dix, New Jersey, Jordan Hollingsworth, Officer LaTasha
Rogers, Lieutenant Joseph Anderson, Officer Brian Virgillo, and
John or Jane Does Nos. 1-20 and XYZ Corporations Nos. 1-10, for
injuries he sustained as a result of an assault by another
inmate or inmates while incarcerated at FCI Fort Dix.  ECF No.
1.

Presently before the Court is Defendants' Motion to Dismiss
for lack of jurisdiction pursuant to Federal Rule of Civil
Procedure 12(b)(1), which is ripe for adjudication.  ECF Nos. 12
(motion), 19 (opposition brief), 23 (reply).  For the reasons
that follow, the Court will grant the Motion in part.

**I.  BACKGROUND**

**A.  Allegations Contained in the Complaint**

Plaintiff Benjamin Parker brings this civil action under
the Federal Tort Claims Act ("FTCA"), alleging that he was
assaulted by an unknown inmate or inmates while he was
incarcerated at the Federal Correctional Institution in Fort
Dix, New Jersey, and that this attack occurred as a result of
the negligence on the part of the BOP and its employees.
Plaintiff generally alleges that the defendants were negligent
in creating the conditions that led to his assault because (1)

2

certain actions by defendants may have resulted in the perception that Plaintiff was cooperating with prison officials in an investigation akin to being a "snitch," (2) they created dangerous conditions by leaving loose cinder blocks and other debris in the second floor bathroom of Plaintiff's housing unit, and (3) staffing was insufficient to prevent the attack on Plaintiff. See ECF No. 1. Plaintiff names as Defendants Jordan Hollingsworth (the former warden of FCI Fort Dix), Officer LaTasha Rogers, Lieutenant Joseph Anderson, Officer Brian Virgillo, the BOP, and the United States of America. See id. at 1, 11.

At the time of the incident, Plaintiff was incarcerated at FCI Fort Dix and housed, in the East Compound in Unit 5741 (the "Unit"), which housed approximately 300 inmates. Id., ¶¶ 18-19. Generally, Defendants assigned only one corrections officer to be on duty and that officer was responsible for monitoring and supervising Unit 5741. The corrections officer's office was located on the first floor of the Unit. Id., ¶ 20.

Plaintiff was housed on the second floor of the Unit, in a 12-person room with a door that did not lock. Id., ¶ 21. There was a large bathroom on that second floor (the "Bathroom") that was left in a constant state of disrepair. Id., ¶ 22. On a near weekly basis, Defendants' or their employees routinely removed cinder blocks from the Bathroom walls and shower stalls

in search of contraband. Id., ¶ 23. In the process, they would
leave behind an accessible pile of cinder blocks and other
construction debris, which were left unattended and accessible
to all inmates for days at a time. Id., ¶¶ 24-25. Plaintiff
alleges that these cinder blocks and debris created an obvious,
known, and plainly visible risk and danger to the inmates housed
at in the Unit. Id., ¶ 26. By creating this debris pile,
Defendants provided some of the violent and dangerous inmates at
the Fort Dix with weapons to use against other inmates against
whom they had disagreements or confrontations, such as
Plaintiff. Id., ¶ 27.

On September 6, 2015, at approximately 10:00 a.m.,
Plaintiff's name was called over the public address system,
instructing him to report to Defendant Special Investigative
Services ("SIS") Lieutenant Anderson's office. Id., ¶ 31.
Defendant Anderson brought Plaintiff into the SIS Office to be
interviewed regarding an investigation into an alleged extensive
gambling ring involving several inmates at FCI Fort Dix. Id., ¶
32. Plaintiff explained that he was not involved in that
gambling operation. Id., ¶ 33. Plaintiff knew next to nothing
about it and had no information to provide to the investigation.
Id., ¶ 36.

Another inmate, who had been threatened with violence by
the inmates who were operating the illegal gambling ring and had

a significant gambling debt, had reported the matter to the Defendants or their employees. Id., ¶ 37. During that inmate's report, Plaintiff alleges that he falsely identified Plaintiff as being the "enforcer" for the gambling ring. Id., ¶ 38. According to Plaintiff, this false tip or fabrication was the reason Defendants wanted to interview Plaintiff. Id., ¶ 39.

Plaintiff alleges that Defendants knew or should have known that the inmates running that illegal gambling ring were dangerous and had already threatened physical harm to other inmates, including the inmate making the false report. Id., ¶ 41. Plaintiff describes Defendants' actions as putting a "target" on his back and inviting an unjustified and unwarranted retaliatory attack on Plaintiff.

Ten days later, on Wednesday, September 16, 2015, Defendant SIS Agent Officer Virgillo escorted Plaintiff from Unit 5741 to the SIS Office. Id., ¶ 45. Plaintiff was questioned about the gambling operation again and Plaintiff explained that he had no involvement. Id., ¶ 46.

Two days later, on September 18, 2015, Plaintiff was attacked by one or more inmates. Id., ¶ 48. Plaintiff was struck multiple times in the head with a blunt object, which Plaintiff alleges was a cinder block or some other piece of construction debris that Defendants' staff had left in the Bathroom. Id., ¶ 49. According to the Complaint, the assault

occurred between 6:00 a.m. and 6:15 a.m. when Officer LaTasha Rogers was on duty in the Unit. Id., ¶¶ 50, 53-54. Plaintiff sustained significant, permanent injuries including brain damage, a posttraumatic epileptic episode, severely broken facial bones, permanent loss of vision, smell, and taste, and permanent bodily pain and discomfort. Id., ¶ 52.

Plaintiff alleges that he was housed in FCI Fort Dix's Special Housing Unit when he returned from the hospital and has not been able to obtain records relating to the investigation into the gambling ring or the attack against him, impairing his ability to "get access to the entire truth of the events" that are alleged in the Complaint. Id., ¶¶ 56, 58-60. In the Complaint, Plaintiff only asserts an FTCA claim against the Defendants (Count 1).

**B.   Defendants' Supplemental Facts Regarding Jurisdiction**

FCI Fort Dix is a federal prison with the primary mission of housing low security sentenced federal inmates. See ECF No. 12-5. The facility, a former military barracks not constructed as a typical BOP prison, consists of two separate compounds, the East Compound and the West Compound. Id. Each compound contains numerous buildings, including six or seven dormitory-style buildings where inmates are quartered, buildings for inmate recreation and education, food-service buildings, Federal

Prison Industries buildings, and administrative buildings, including a Lieutenant's complex.  Id.

The buildings used as inmate housing units at FCI Fort Dix are three stories high and contain multi-purpose rooms, television rooms, exercise areas, staff offices, and inmate dormitory rooms.  Id.  The dormitory rooms are typically twelve-man rooms with some two-man rooms as well.  Id.  The dormitory rooms do not have locks on the doors, and each floor has open doors allowing free movement between the floors.  Id.

The housing units also have large bathrooms on each floor, staff offices, and television rooms.  See ECF No. 12-4.  The walls are made of cinderblock.  Id.  As a general rule, inmates are permitted to move freely about the housing unit; however, they are to remain in their rooms at nighttime usually after 11:00 p.m. and during inmate counts.  See ECF No. 12-5.  There are approximately 350 inmates assigned to each housing unit. Id.

Each housing unit is staffed with a "Unit Team," comprised of a unit manager, a case manager, and a correctional counselor. See id.  These positions are typically day-watch assignments (from 7:30 a.m. to 4:00 p.m.).  See id.  In addition, one correctional officer is assigned to each housing unit during all shifts.  See id.  During off-shifts, meaning not during the day

shift, the unit officer is solely responsible for monitoring all three floors and all 350 inmates of the housing unit.  See id.

During a routine work week, inmates typically leave their assigned housing units for a work assignment.  See id.  If an inmate has no work assignment or has the day off, he can spend the day in recreation, the library, education classes, hobby craft, etc.  See id.  An inmate can move to the different areas of the compound during designated "moves," which give an inmate a specific timeframe to walk from one location to the next.  See id.  During a move, the unit officer opens the housing unit door and typically stands inside or outside of the doorway in order to monitor inmate movement.  See id.  After the move, an inmate must remain in his chosen location until the next ten-minute move is called.  See id.

There is no federal statute, regulation, or policy that requires the BOP to take a particular course of action to ensure an inmate's safety from attacks by another inmate.  See id.  Furthermore, there has never been any BOP regulation or policy in effect that dictated the number of correctional officers a warden of a BOP facility was required to assign to monitor or supervise a particular security post within the institution.  See id.

There likewise is no policy or regulation that mandates the placement of the assigned correctional officers within a BOP

facility or housing unit. See id. Rather, the authority to determine the number and placement of correctional officers within a BOP facility is a matter that is left to the discretion of each BOP warden. See id. Among the factors that each warden considers are the safety of inmates, the safety of BOP staff, how to effectively deploy limited staff resources, and prison security generally. See id.

The SIS Department at Fort Dix consists of SIS lieutenants and technicians, who conduct investigations of inmates committing violations of BOP rules or criminal law, gather intelligence, maintain a urinalysis program, and serve as the law enforcement liaison with local law enforcement departments. See ECF No. 12-4.

Inmates at FCI Fort Dix frequently use common areas such as bathrooms and television rooms to conceal contraband in such a way as to make identifying the possessor nearly impossible. See id. Inmates frequently conceal homemade intoxicants behind walls in the restrooms by removing cinderblocks, placing the homemade intoxicants inside of the walls, and replacing the cinderblocks. See id. They also remove urinals in a similar fashion in order to hide contraband. See id.

The BOP requires searches of inmates, their housing units, and work areas in order to locate contraband and deter its introduction, in accordance with 28 C.F.R. § 552.14 and Program

Statement 5521.06.  See id.  The only guidance provided as to housing unit searches is to "[l]eave the housing or work area as nearly as practicable in its original order." 28 C.F.R. § 552.14(b).  The Correctional Services Manual instructs staff members to look for contraband in areas such as hidden compartments and hollow legs.  See ECF No. 12-4.  Housing Unit staff members must search these areas in order to find contraband and to deter future behavior.  See id.

Many times, if staff members receive a tip or if there is evidence of disruption of walls or other infrastructure, the searches involve having to further disturb that area in order to retrieve the contraband.  See id.  While staff members attempt to immediately restore the area back to its prior condition, there are times when additional maintenance is necessary.  See id.  There is no policy, regulation or statute that specifically instructs how staff members search for and retrieve contraband.  See id.  Nor is there any policy, regulation, or statute that directs staff members how to keep cinderblock or other building materials away from inmates.  See id.

With respect to SIS investigations, the SIS Manual dictates timelines for investigations and what documents are required to be part of the case file.  See id.  It also dictates that all victims and witnesses must be interviewed.  See id.  There is no

guidance regarding how or where interviews are to be conducted.
See id.

At Fort Dix, if an inmate in the general population needs
to be interviewed as a suspect, victim, or witness, a lieutenant
typically contacts the housing unit officer to instruct the
inmate to report to the Lieutenant's Office. See id. If the
inmate cannot be immediately located, he is called over the
institution intercom and instructed to report to the
Lieutenant's Office. See id. Defendants state that this is the
safest way to conduct an interview as it draws less attention to
the inmate than if the SIS Agent or Lieutenant reported to the
housing unit and retrieved the inmate. See id. Inmates are
called to the Lieutenant's Office for many other reasons,
including random urinalysis, serving of incident reports, and
general counseling of inmates. See id. An intercom
announcement does not reveal that an inmate is a participant in
an SIS investigation. See id.

There are no rules, regulations, or statutes that require
the investigation or interviewing of inmates to be conducted in
any particular type of manner. See id. FCI Fort Dix has chosen
a procedure which works best to suit inmate safety given the
layout of the facility. See id. The SIS building is located
outside of the secure perimeter at FCI Fort Dix. See id.
Accordingly, SIS staff use the Lieutenant's complex (which is

11

inside of the secure perimeter) when contact with an inmate is necessary.  See id.

## II.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case.  See Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006).  When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." Id. at 302 n.3.

There are two types of Rule 12(b)(1) motions.  A "facial" attack assumes that the allegations of the complaint are true but contends that the pleadings fail to present an action within the court's jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  A "factual" attack, however, asserts that, while the pleadings themselves may facially establish jurisdiction, one or more of the factual allegations is untrue, causing the case to fall outside the court's jurisdiction.  Id. at 891.  In such a case, "no presumptive truthfulness attaches to plaintiff's allegations" and the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue.  Id.

With a factual attack, such as that presented here by Defendants,[1] the Court is free to consider evidence outside the pleadings and weigh that evidence.  See Petruska, 462 F.3d at 302 n.3; Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).  "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  Petruska, 462 F.3d at 302 n.3 (quoting Mortenson, 549 F.2d at 891).

## III. DISCUSSION

### A.    Dismissal of Individual and BOP Defendants

The Individual Defendants and the BOP have moved to be dismissed as defendants because the actions at issue in the Complaint were taken in the course of their federal employment, and under the FTCA, the United States it the only proper defendant in such a circumstance.  Plaintiff appears not to oppose this defense in its opposition to the Motion.  See ECF No. 19.

---

[1] Defendants note in their opening brief that their motion to dismiss is a factual attack on the alleged jurisdiction.  See ECF No. 12-8 at 6 n.3.  Plaintiff's argument that documents outside the pleadings are improper is thus inapposite to the procedural posture presented by this Motion.  Further, Plaintiff's request for discovery regarding certain BOP policies and manuals appears to have been satisfied by Plaintiff's production of those materials, see ECF No. 24.  Plaintiff has not renewed his request for discovery since the provision of these documents.

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)). The Federal Tort Claims Act, which provides the exclusive remedy for tort claims against the United States, is a limited waiver of sovereign immunity. See Santos v. United States, 559 F.3d 189, 193 (3d Cir. 2009).

Pursuant to that statute, the United States shall be liable, to the same extent as a private party, "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. §§ 1346(b), 2679(b)(1). The only appropriate defendant in an FTCA action, however, is the United States. See 28 U.S.C. § 2679(a); Priovolos v. FBI, 632 F. App'x 58, 60 (3d Cir. 2015) (citing CNA v. United States, 535 F.3d 132, 138 n.2 (3d Cir. 2008)); Feaster v. Fed. Bureau of Prisons, 366 F. App'x 322, 323 (3d Cir. 2010).

In this case, Plaintiff brings only a FTCA claim but also includes as defendants the BOP and four federal employees who were acting within the scope of their federal employment at the time of the events alleged in the Complaint. See ECF Nos. 1;

12-2 at 1 (Certification of Scope of Employment).  Federal

agencies, such as the BOP, may not be sued under the FTCA.  See

Priovolos, 632 F. App'x at 60.  In addition, because Plaintiff's

tort claims arise out of alleged actions taken by the individual

defendants in the scope of their federal employment, the

individual defendants are not proper defendants and must be

dismissed.  See, e.g., Murchison v. Warden Lewisburg USP, 566 F.

App'x 147, 150 (3d Cir. 2014); Bey v. Bruey, No. 09-cv-1092,

2009 WL 961411, at *8 (D.N.J. Apr. 8, 2009).  Accordingly, the

claims against the BOP and the named individual defendants, as

well as the unidentified individual and corporate defendants

will be dismissed for lack of jurisdiction.

**B.    Failure to Exhaust Supervisory Liability Claim**

Defendants move to dismiss the supervisory liability claim

in the Complaint on the basis of lack of exhaustion.  Under the

FTCA, 28 U.S.C. § 2675(a),

> An action shall not be instituted upon a claim against
> the United States for money damages for injury or loss
> of property or personal injury or death caused by the
> negligent or wrongful act or omission of any employee
> of the Government while acting within the scope of his
> office or employment, unless the claimant shall have
> first presented the claim to the appropriate Federal
> agency and his claim shall have been finally denied by
> the agency in writing and sent by certified or
> registered mail.  The failure of an agency to make
> final disposition of a claim within six months after
> it is filed shall, at the option of the claimant any
> time thereafter, be deemed a final denial of the claim
> for purposes of this section.  The provisions of this
> subsection shall not apply to such claims as may be

15

> asserted under the Federal Rules of Civil Procedure by
> third party complaint, cross-claim, or counterclaim.

Id.

There is no dispute that Plaintiff did file a proper claim and did file the Complaint within the appropriate time period after receiving a response to his claim.  The dispute concerns the scope of the claim.

A "claim" as that term is used in § 2675 includes a written statement describing the injury in sufficient detail to allow the agency to begin an investigation into the possibility of potentially tortious conduct and a request for a sum certain in damages.  See Tucker v. U.S. Postal Serv., 676 F.2d 954, 959 (3d Cir. 1982); Estate of Trentadue ex el Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005).  In addition, "a claim shall be deemed to have been presented when a Federal agency receives from a claimant . . . an executed Standard Ford 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident."  28 C.F.R. § 14.2(a).  "Although an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a), . . . a plaintiff cannot present one claim to the agency and then maintain suit on the basis of a different set of facts."  Roma v. United States,

16

344 U.S. 352, 362 (quoting <u>Deloria v. Veterans Admin.</u>, 927 F.2d 1009, 1011-12 (7th Cir. 1991).

Plaintiff's "basis of the claim" contained in the Standard Form 95 provides,

> This claim concerns life threatening injuries that caused permanent damage suffered by claimant Benjamin Francis Parker . . . while incarcerated at FCI Fort Dix ("Ft. Dix."). It is based on federal employees' negligence when they allowed him to be viciously assaulted on September 19, 2015 . . . . Bureau of Prisons ("BOP") employees' negligent conduct contributed to the September 18, 2015 assault . . . .

<u>See</u> ECF No. 12-7. The narrative describes the debris left in the bathroom left by staff, the circumstances surrounding the SIS investigation and the summoning of Plaintiff, the staffing levels for the housing unit, and many other details. <u>See</u> <u>id.</u> The Court finds this description in the "basis of the claim" sufficient to encompass the FTCA claim contained in the Complaint, which is a claim alleging that BOP employees' actions negligently caused or contributed to the assault on Plaintiff. Defendants' Motion to Dismiss as it relates to exhaustion is denied.

## C. Discretionary Function of Alleged Negligent Acts

Defendant the United States alleges that Plaintiff may not assert any of his claims against it because each category of alleged conduct is a discretionary government function that may not serve as a basis for a claim under the FTCA. Plaintiff

responds that the actions negligently caused or contributed to
the assault on him  - the accessibility of the allegedly
weaponized cinder blocks and effectively labelling Plaintiff as
a snitch - both created a foreseeable dangerous condition and
are beyond the scope of the discretionary function exception.
Given the limited record before it, the Court declines at this
time to decide the application of the exception.

Under the discretionary function exception, the United
States may not be held liable for alleged negligence "based upon
the exercise or performance or the failure to exercise or
perform a discretionary function or duty . . . whether or not
the discretion involved be abused."  28 U.S.C. § 2680(a).  This
exception "marks the boundary between Congress' willingness to
impose tort liability upon the United States and its desire to
protect certain governmental activities from exposure to suit by
private individuals."  United States v. S.A. Empresa de Viacao
Aereo Rio Grandense, 467 U.S. 797, 808 (1984).  Through this
exception, Congress sought to "prevent judicial second-guessing
of legislative and administrative decisions grounded in social,
economic, and political policy through the medium of an action
in tort."  United States v. Gaubert, 499 U.S. 315, 323 (1991).

To determine whether the discretionary function applies, a
court first "must identify the conduct at issue."  S.R.P. ex
rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir.

18

2012). The court must then follow a two-step inquiry. First, the court must determine "whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." Baer v. United States, 722 F.3d 168, 172 (3d Cir. 2013) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)). An act involves judgment or choice if there is no "federal statute, regulation, or policy specifically prescrib[ing] a course of action for an employee to follow." Cestonaro v. United States, 211 F.3d 749, 753 (3d Cir. 2000).

Second, if "a specific course of action is not prescribed, [the court] proceed[s] to the second step, which requires [the court] to determine whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield." S.R.P., 676 F.3d at 333. The actions at issue must be "susceptible to policy analysis" or "based on the purposes that the regulatory regime seeks to accomplish," Gaubert, 499 U.S. at 325 & n.7. See also Cestonaro, 211 F.3d at 753. More specifically, with respect to the second requirement, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." Berkovitz v. United States, 486 U.S. 531, 537 (1988). See generally S.R.P., 676 F.3d 329. The discretionary function

19

exception is a jurisdictional defense that a party can raise in a Rule 12(b)(1) motion. See Bedell v. United States, 669 F. App'x 620, 621 n.1 (3d Cir. 2016).

As alleged in the Complaint, some of the relevant conduct at issue involves the alleged negligence of leaving cinder blocks and other construction debris in the Bathroom for days at a time where inmates had unfettered access to it and where no corrections officer was generally monitoring. Defendants, the party moving for the benefit of the exception, provide almost no facts regarding the alleged cinder blocks and other construction debris left in the Bathroom that was the situs for the assault on Plaintiff. There are no facts regarding how or why such debris was there or for how long it remained there.

They explain the policy rationale for why the cinder blocks were removed--to discover contraband--but do not explain the policy rationale for leaving it there for days as alleged. Nor do Defendants address how the leaving of cinder blocks or other construction debris for such a time period is the sort of discretionary function that the "exception was designed to shield" or how allowing such a condition for a period of days advances the policy of the prevention or discovery of contraband.

Finally, it is unclear from the record whether any non-discretionary standards on the maintenance, clean-up, or repair

of potentially hazardous or dangerous conditions from a facilities or property management perspective exist, which may impact the application of the exception.  It may be that Defendant can provide facts that support the application of the discretionary function exception.  The Court is unable to make such a determination at this time.  As such, Defendant's Motion to Dismiss as it relates to the discretionary function exception is denied without prejudice.

**IV.  CONCLUSION**

The Court will grant in part the Motion to Dismiss.  An appropriate order follows.


Dated: June 27, 2019          s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.